IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-CV-467-FL

EMEKA EMEKAUWA,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )                    ORDER
                                   )
THE SHAW UNIVERSITY,               )
                                   )
                Defendant.[1]      )


        This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6), (DE 23), and plaintiff's motion to allow discovery, (DE 25). The issues

raised are ripe for ruling. For the following reasons, the court denies defendant's motion to dismiss

and denies plaintiff's motion as moot.

## BACKGROUND

        On September 13, 2017, plaintiff filed a qui tam suit under seal on behalf of the United States

asserting claims under the False Claims Act, 31 U.S.C. § 3729 et. seq. ("FCA"), against his former

employer defendant Shaw University. Plaintiff, former general manager of defendant's radio

station, WSHA-FM, alleges that defendant 1) overstated its revenues and expenditures above and

beyond its radio station's budgetary documents in its audited financial reports to increase its grant

awards from the Corporation for Public Broadcasting ("CPB") and 2) retaliated against plaintiff for

voicing his belief that defendant was out of compliance with reporting requirements.

---

[1] The court constructively amends the caption to reflect plaintiff's dismissal of formerly-asserted claims
on behalf of the United States. (See DE 13).

The United States declined to intervene. (DE 10). Subsequently, plaintiff moved to dismiss his first claim under section 3729 and to proceed individually on his retaliation claim under an amended complaint, (DE 13), which the court allowed on October 9, 2018.

Plaintiff filed amended complaint the next day, (Am. Compl. (DE 22)), and on October 29, 2018, defendant filed instant motion to dismiss, (DE 23), attaching in support three documents: 1) CPB's Radio Community Service Grant General Provisions and Eligibility Criteria (the "General Provisions"), 2) CPB's Financial Reporting Guidelines For Preparing The Annual Financial Report & Financial Summary Report, and 3) February 12, 2016 audited financial statements for defendant's radio station.

On November 21, 2018, plaintiff filed opposition to defendant's motion to dismiss which also sounds as motion for the court to allow discovery, arguing documents attached to defendant's motion and arguments made by defendant are properly brought pursuant to Rule 56, not Rule 12(b)(6), requesting the court to either defer ruling on defendant's motion and allow discovery or strike defendant's motion insofar the arguments contained therein relate to questions of evidence and not the sufficiency of plaintiff's pleadings. (DE 25). Defendant filed opposition to plaintiff's motion on January 28, 2019, maintaining defendant's motion is properly brought pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

The facts alleged in the amended complaint relevant to the resolution of the instant motions may be summarized as follows.

A.	Corporation for Public Broadcasting and Community Service Grants

In order for a public broadcasting station to receive a community service grant ("CSG") from the CPB, the station must certify annually to the CPB that they comply with the requirements of the Communications Act of 1934 ("Communications Act"), 47 U.S.C. § 396, et seq., as a condition of accepting a CSG.  The Communications Act requires that CSG recipients undergo audits of their books and financial records, conducted by public accountants, and retained according to the form required by the CPB.  The Communications Act requires, inter alia, that, "funds may not be distributed [under the CSG] . . . to any public telecommunications entity that does not maintain for public examination copies of the annual financial and audit reports, or other information regarding finances, submitted to the [CPB] . . . ." 47 U.S.C. § 396(k)(5).

The CSG allocation to radio stations features a base grant in addition to an "incentive grant" or matching grant, which is calculated in part according to the amount of non-federal financial support ("NFFS") accrued by the grantee during a particular period of time.  Accordingly, fluctuations in the amount of NFFS accrued or reported by the grantee may cause the amount of the incentive grant authorized to the grantee to rise or fall in turn.

Plaintiff alleges that as recently as April 2017, the CPB office of the inspector general began to identify incorrect calculations of NFFS and admonished grantees that "[i]f not calculated correctly, non-federal financial support may be overstated and subject your station to a penalty under the CSG Non-compliance Policy."  (Am. Compl. (DE 22) ¶ 15).  Overstated NFFS can cause the CPB's incentive grant component of the CSG to allocate more federal funds to the grantee than that grantee may be entitled to receive.

B.    Plaintiff's Work at WSHA-FM

Defendant has owned WSHA-FM since 1968.  Plaintiff worked for defendant for nearly 29 years as general manager of WSHA-FM, from his date of hire in August 1987 until his termination on or about July 8, 2016.[2]  Under plaintiff's leadership of WSHA-FM, the radio station earned millions of dollars in donations, signed contracts with major telecommunications companies such as Verizon, Sprint, and T-Mobile, and built a radio tower for defendant which was appraised at over $3,000,000.00 in 2008 and has earned approximately $250,000.00 in annual revenue for defendant for over 20 years.  Plaintiff maintained high performance evaluations throughout his employment until February 2016.

By virtue of plaintiff's position as general manager, plaintiff alleges he had intimate knowledge of WSHA-FM's budget, including its itemized expenditures.  As part of plaintiff's job duties, he was regularly required to review WSHA-FM's budget to make requests for approved expenditures under that budget, including approving personnel expenditures, travel costs, and other financial outlays incurred during the station's operation.  Plaintiff held a general understanding of the amounts of revenue brought in by WSHA-FM, including the various sources of revenue such as fundraising and renting the use of the station's radio tower.  Plaintiff received regular annual training on the CSG grant requirements by and through his annual attendance at CPB conferences held for the same purpose in Washington, D.C.

---

[2]      In addition to his continuous management of WSHA-FM, plaintiff served in a variety of other capacities at defendant and was promoted on numerous occasions.  He was promoted to Associate Professor in 1992, Assistant Vice President for Academic Affairs in 1995, Coordinator for the Center for Alternative Programs in Education (CAPE) in 1996, and attained full professor status in 1999.

C.    Financial Management of WSHA-FM

Throughout plaintiff's tenure as general manager of WSHA-FM, defendant largely exerted exclusive control over the financial management of WSHA-FM operations by and through the department of fiscal affairs.  Plaintiff did not have control over developing the WSHA-FM budget throughout his tenure at WSHA-FM.  At all times relevant to the complaint, WSHA-FM's budget was created by defendant's vice president of fiscal affairs and the vice president of institutional advancement, from whom plaintiff was required to obtain approval for requisitions.

Substantially all income generated by WSHA-FM was directed to defendant and was not deposited directly into WSHA-FM internal accounts but instead into defendant's general fund. For example, revenue generated by WSHA-FM, including leasing of the radio tower, was directed to fiscal affairs and not retained in WSHA-FM's own accounts.

Plaintiff was able to review budgetary documents that represented WSHA-FM's budget for the fiscal year.  Specifically, plaintiff was able to access WSHA-FM's general fund as well as the CSG fund.  WSHA-FM's general fund and the CSG fund represented the only two bank accounts associated with WSHA-FM's operations.

D.    WSHA-FM and Community Service Grants

In 1992, defendant began to apply for and receive CSGs to support its radio operations.  In the most recent years of WSHA-FM's operations, the radio station received the following in CSGs over the course of the following fiscal years: 2011: $136,215.00; 2012: $122,442.00; 2013: $136,141.00; 2014: $179,245.00; 2015: $175,475.00.

For each year in which defendant received a CSG, defendant, by and through its agents, was subject to multiple requirements including the requirement to certify the accuracy of its financial

documentation, describing the assets, liabilities, expenditures, and revenue over a specified period of time, which was submitted to the CPB and was published and made available to the general public; to report and annually certify an amount it received in NFFS; and to read and sign their assent to the Radio Community Service Grant Agreement and Certification of Eligibility ("CSG Agreement").

For all years relevant to the complaint, the CSG Agreement's language was substantially similar to that included in the CSG Agreement for fiscal year 2016, which stated in relevant part:

> A. **Grant Offer and Acceptance**: CPB offers and Grantee accepts the grant (Grant(s)) set forth in Section III below, subject to all of the terms and conditions herein. CPB has calculated and offered the Grants in reliance and contingent upon the accuracy of the following:
>
> 1. The representations and warranties made by the Grantee to qualify for and receive the following Grants:
>
>    • FY 2016 Radio Community Service Grant (CSG); . . .
>
> 2. Grantee's Fiscal Year (FY) 2014 financial report.
>
> B. **Conditions**: In addition to the terms and conditions stated herein, this Agreement includes and the Grantee must fully comply with CPB's Radio Community Service Grant General Provisions and Eligibility Criteria . . . , the certification requirements set forth in the Communications Act of 1934, . . . and the Financial Reporting Guidelines . . . All of these documents . . . are incorporated herein by reference as if fully set forth herein.

(Id. ¶ 47).

For such CSG Agreements, grantees such as defendant were required to certify its compliance with a checklist of criteria, including that the grantee complied with the General Provisions for eligibility. In the General Provisions, the CPB warned grantees that, "improper certification may result in penalties under the Federal False Claims Act." (Id. ¶ 49).

6

Plaintiff alleges defendant knowingly submitted its Audited Financial Reports ("AFR") and Audited Financial Statements ("AFS") to the CPB, and published the same on the WSHA-FM website, with knowledge that the CPB would rely upon the accuracy of the same in approving the payment of the CSG monies.

Additionally, within each annual CSG Agreement, language substantially similar to the following used in the CSG Agreement for fiscal year 2016 was included:

**E. Representations and Warranties:** Grantee represents and warrants:

1. The information provided in this application is true and accurate;
2. That Grantee understands that using false information to obtain the Grants may subject the Grantee to penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733; . . .
4. That Grantee shall comply with all of the terms and conditions herein and in the General Provisions . . . .

(Id. ¶ 52).

Agents acting on behalf of defendant were required to sign, and did sign, specific certifications of eligibility for each annual CSG Agreement, including an express certification that "Grantee complies with the General Provisions" provided in the CSG grant. (Id. ¶ 53).

For each year defendant received a CSG allocation, defendant's president as well as plaintiff signed the CSG Agreement and signed other documents material to the CPB's determination to approve disbursement of the CSG to defendant, certifying their compliance with the CSG requirements, including but not limited to those aforementioned, and defendant caused the same to be submitted to the CPB for payment of the CSG.

E.      Plaintiff's Complaints to Defendant Prior to 2016

During the annual CSG application and AFR/AFS reporting processes, fiscal affairs worked directly with defendant's chosen auditor, BDO USA, LLP ("BDO"), to prepare the same. Beginning in 2007, plaintiff began to be included in reviewing the AFR/AFS prior to its submission to the CPB.

From the outset of plaintiff's inclusion in this process, plaintiff identified exaggerated amounts claimed as expenditures for WSHA-FM. Plaintiff was further concerned that inflated expenditures were being used to cover similarly inflated revenues, including for the purpose of increasing the matching grant component of the CSG. Plaintiff communicated his concerns promptly to his supervisors, including but not limited to the instances discussed below.

On or about February 2, 2007, plaintiff emailed Tom Poitier ("Poitier"), then defendant's vice president of fiscal affairs, stating:

> I have received the second draft for WSHA's Annual Financial Report (AFR) for 2005-2006. I am still baffled at the figures used in the calculations. . . . This is the first time our AFR has been released to me for review before it was uploaded to CPB. It is perplexing how these figures were reached and applied to WSHA . . . .

(Id. ¶ 57(a)).

On or about March 5, 2008, plaintiff again emailed Poitier regarding the same concerns, stating:

> I am writing, again, to express my concern about the audited WSHA Annual Financial Report filed with CPB this January. This audit report, like that of last year, has some expenditure amounts that are incorrect. . . . The audit report sent to CPB is jeopardizing the grants for WSHA.
>
> I have discussed this problem with you a number of times before. Is it appropriate to include exaggerated amounts as expenditures in financial audited reports for federal grants, . . . ? We need to comply with federal grant provisions. WSHA audit reports may trigger some CPB audits. Thank you.

(Id. ¶ 57(b)).  Later in the morning of March 5, 2008, Poitier responded, "I understand your concern and don't have an answer for you. . . . We make [sic] have to accept the audit report as is . . . ." (Id. ¶ 57(c)).

On or about February 24, 2014, plaintiff emailed then vice president for fiscal affairs Debra Lattimore ("Lattimore"), to voice concern about further compliance issues he identified in the CSG. Lattimore responded to his email shortly thereafter, stating: "Please do not hold up the audit, by not signing the representation letter that the auditors requested. After you sign the letter, I have to get the President to sign it. Time is precious. If we don't get the letter to them soon, the audit will be late." (Id. ¶ 57(d)).

Plaintiff alleges that regarding each of the above, his concerns were not addressed and he was pressured to sign off on the audits, but the personnel involved at that time did not take any retaliatory action against plaintiff.[3]

F.     Plaintiff's Complaints to Defendant in 2016

On or about August 6, 2015, Clarenda Stanley-Anderson ("Stanley-Anderson") was hired as defendant's vice president for institutional advancement.  Stanley-Anderson acted as plaintiff's direct supervisor from the beginning of her employment with defendant until the hiring of Sonja Bennett-Bellamy ("Bennett-Bellamy"), and remained plaintiff's supervisor's supervisor until plaintiff's termination on or about July 8, 2016.

---

[3]     Plaintiff alleges that while he had complained numerous times over the years about the inaccuracy of the WSHA-FM financial reporting, his concern become even more urgent in light of the 2013 conviction of a Shaw University professor, Ademola Ejire, for diverting approximately $470,000 in grant funding from a federal government grant through the Environmental Protection Agency.  Additionally, in 2011 and 2012, plaintiff observed evidence of suspicious transactions and disappeared grant money for WSHA-FM relating to incidents separate and apart from the CSG grant documentation, including documentation regarding renovations to the radio station to which plaintiff was not aware occurred and checks payable to interns where no such interns were employed at WSHA-FM.

On or about January 14, 2016, Bennett-Bellamy was hired by defendant as the associate vice president of institutional advancement. Bennett-Bellamy served as plaintiff's direct supervisor from the beginning of her employment until plaintiff's termination. Throughout this period, Bennett-Bellamy remained under the training and instruction of Stanley-Anderson.

On February 12, 2016, plaintiff received a copy of the AFS for the fiscal year 2014-2015, prepared by BDO and fiscal affairs without plaintiff's input. The AFS was due that same day, and plaintiff had a limited amount of time to review the same. Nonetheless, plaintiff discovered that the AFS stated for fiscal year 2014-2015 "Total Expenditures and Losses" of $795,931.00, and included within this number were $227,881.00 allegedly spent on "Production and Broadcasting," $479,864.00 on "Management and general," and $88,186.00 spent on "Fundraising and membership development."

Plaintiff identified that the AFS numbers described as expenses were far above and beyond the total amounts reflected in the fiscal year 2014-2015 budget reports for the two accounts associated with WSHA-FM: the general fund account ("#555 Account") and the CSG segregated account. Plaintiff alleges the combined total of the aforementioned accounts for fiscal year 2014-2015 amounted to approximately $421,024.40. Accordingly, the total amount recognized as expenditures in the WSHA-FM fiscal year 2014-2015 budget reports were $374,906.00 less than the amount reflected in the AFS.

On or about Friday, February 12, 2016, plaintiff sent an email to the BDO auditor, copying Gwendolyn Webb ("Webb"), then vice president of fiscal affairs, stating:

> From the audit report, WSHA incurred $795,931.00 expenditures and losses for the Fiscal Year that ended June 2015. In the past, the AFR submission has been waited until the last minute and this has limited the explanations needed for such figures. As a non-accountant, please help me out in understanding how these expenditures

and losses were calculated. I need you to email me the listing and details of the requisitions and expenditures for each of the above areas to ensure that we have the correct amounts for the audit.

(Id. ¶ 66).

Later that afternoon, after Webb forwarded plaintiff's email to Stanley-Anderson, Stanley-Anderson sent an email to plaintiff asking whether one of plaintiff's employees could answer her question. Plaintiff responded the employees did not have access to that information and further restated his complaint as follows:

Since the Fiscal Affairs office has all the information that was given to the auditors, it would be best if the details of the expenditures and losses released by them.

I do not recall losses at WSHA. Instead, the station has generated funds every year over and beyond the annual 555 budget.

When calculated, the total 555 budget for FY 2014-2015 was $266,605.33. How can the station incur expenditures and losses at $795,931.00? There is absolutely no way the fiscal affairs Jenzabar system would allow and approve any requisition expenditures over budget and beyond the allocation for each area, not to mention the total annual budget. How then could WSHA spend beyond the total budget allocation irrespective of the fact that the station generated funds from donations, tower, underwriting and grants?

This is why I want to have the explanation and details of the $795,931.00 expenditures.

(Id. ¶ 67).

Several minutes later, at approximately 4:07 p.m., Stanley-Anderson responded to the above email stating:

Losses and profits are calculated by Finance and confirmed by our independent auditors. Thus, those are the numbers we will base decisions on.

Have Nicole – or whoever you have designated to enter requisitions – pull every requisition that has been submitted.

Calculate the totals and provide me with that information by 6pm today.

(Id. ¶ 68).

Plaintiff responded three minutes later and provided the location of the requested materials in defendant's computer system and fiscal affairs office. Plaintiff alleges Stanley-Anderson responded "sternly," stating "I will accept this as refusal on [plaintiff's] part to provide the deliverables requested." (Id. ¶ 69).

Later in the evening, at approximately 7:23 p.m., Webb sent plaintiff an email, copying Stanley-Anderson, requesting that plaintiff submit the final audit paperwork, despite his unresolved concerns regarding the accuracy of the AFS. Nearly two hours later, Stanley-Anderson responded to Webb's email, stating "[h]e doesn't check email like that," meaning after hours. (Id. ¶ 70). Also in the evening of February 12, 2016, Stanley-Anderson sent plaintiff an email demanding "an explanation as to why [the audit] was not submitted and why you have not responded to e-mails." (Id. ¶ 71). On Saturday, February 13, 2016, at approximately 9:29 p.m., Stanley-Anderson sent plaintiff another email demanding confirmation of her "assum[ption that] this matter has been resolved." (Id. ¶ 72).

On or about February 25, 2016, Stanley-Anderson emailed plaintiff stating the following:

> I am requesting a collective meeting between WSHA/IA [Institutional Advancement] and Finance to discuss some concerning claims that monies for WSHA are being misused.
>
> Ms. Bennett-Bellamy has shared your concerns and we want to ensure that we provide you with the proper platform to fully air your concerns and an opportunity for Finance to provide responses.

(Id. ¶ 74). Shortly thereafter, on March 1, 2016, plaintiff met with Webb and Stanley-Anderson to discuss his concerns about the audit reporting. In this meeting, Webb informed plaintiff that the audit was done by BDO professionals who knew what they were doing. Plaintiff asked for an

explanation regarding the unreasonably high amounts claimed as expenditures on the AFS, but he was refused an answer. Plaintiff alleges that Webb and Stanley-Anderson then accused plaintiff of attempting to spread information that defendant was mismanaging funds.

In the same meeting, Stanley-Anderson began a performance evaluation for plaintiff, out of order with defendant's ordinary process for performance reviews.[4] Stanley-Anderson, in the presence of plaintiff and Bennett-Bellamy, proceeded to give negative marks on plaintiff's performance in every category except for appearance. Plaintiff alleges he was shocked and refused to sign the performance evaluation.

On March 15, 2016, Stanley-Anderson emailed plaintiff with a formal warning, stating in relevant part:

> I provided you an audience with Finance in which the audit was discussed . . .
>
> At the meeting, we discussed the importance of ensuring that accusations are factually based and the potential damage and liability that ensues from making statements that are not factually sound. You were provided an opportunity to present information that refuted the audit findings. You were also informed that the audit was conducted by a third party and reviewed by senior leadership.
>
> In today's meeting, you stated that the audit "made up numbers to make WSHA look bad."
>
> This is a formal warning. Please refrain from accusations or inferences of financial mismanagement. As a member of management, such unfounded comments can cause irreparable damage resulting in reduced confidence from supporters.

(Id. ¶ 79).

---

[4] Plaintiff alleges that at all relevant times to the complaint, defendant had a practice of issuing, once, annual performance reviews towards the end of defendant's fiscal year, typically in June. Only employees on probation are subject to more frequent evaluations. Lee Wood ("Wood"), defendant's human resources director, regularly distributed evaluation forms in April of each year so that performance evaluations could be conducted thereafter.

Plaintiff alleges he was never provided with information that demonstrated the accuracy of the audit. Following receipt of the above warning, plaintiff hired an attorney to address the retaliation he believed he had experienced, as well as to further address the issues of financial mismanagement he believed pervaded defendant's financial reporting.

In a April 22, 2016 letter to defendant's president Tashni Dubroy, and copied to Stanley-Anderson and Bennett-Bellamy, among others, plaintiff, through counsel, stated:

> On or about February 12, 2016, Dr. Emekauwa was asked by Shaw administration to review financial statements prepared for WSHA by a third-party auditor, and discovered what he believed to be a number of financial discrepancies, including the misreporting of expenditures and the omission of certain assets. In a series of e-mails on February 12 to Associate Vice President for Finance & Administration Gwendolyn Webb ("Webb") and auditor Andrea Taylor, Dr. Emekauwa expressed his concerns . . . He did so to comply with Shaw's Whistleblower Policy, under which Shaw "encourages all faculty . . . to report actual or suspected conduct or activities that are a serious violation of University policy or a violation of applicable federal and state law," . . .
>
> Taken collectively, the actions of Shaw administrators and personnel, particularly Stanley-Anderson, are an obvious and clear attempt to harass and retaliate against Dr. Emekauwa for voicing concerns regarding WSHA's finances, intimidate and bully him into approving the audit despite his unaddressed and unresolved questions, disparage and belittle his concerns, and undermine his success and contributions to Shaw. . . . Please consider this letter a formal request that Dr. Emekauwa be protected from further retaliation pursuant to Shaw's Whistleblower Policy.
>
> The conduct of Stanley-Anders and others at Shaw . . . constitute retaliation in violation of Shaw's Whistleblower policy, as Dr. Emekauwa "report[ed] actual or suspected conduct or activities . . . in good faith with reasonable grounds for believing the information disclosed indicates a serious violation of University policy or noncompliance with [state or federal] law."

(Id. ¶ 81).

Plaintiff alleges he began to be subjected to further harassment, intimidation, and undermining of his position when 1) plaintiff's subordinates were directed by Bennett-Bellamy

sometime in March 2016 to report directly to her instead of plaintiff,[5] 2)  Stanley-Anderson made

repeated surprise visits to WSHA-FM on a number of occasions, which visits had never occurred

prior to plaintiff's complaints, and 3) plaintiff was excluded from participating in the routine annual

performance evaluations of WSHA-FM personnel, which task was reassigned by Stanley-Anderson

to Bennett-Bellamy.

On June 17, 2016, Stanley-Anderson, via email, attempted to schedule yet another

performance evaluation for plaintiff.  On June 28, 2016, plaintiff responded to Stanley-Anderson's

email, by repeating his belief that he was being retaliated against and copying Wood, stating in

relevant part:

> In response to your email rescheduling me for another annual performance
> evaluation, let me remind you that you have already evaluated me on March 1st,
> 2016, in the presence of Ms. Sonja Bellamy, the Associate VP-Institutional
> Advancement. And I have the evidence of your evaluation of me.
>
> Furthermore,
>
> 1. why am I being evaluated again after your official performance evaluation of me
> on March 1, 2016? . . . .
>
> 4. is this second performance evaluation because of my questioning the inexplicable
> amounts used for completing and submitting the FY 2014-2015 federal audit for
> WSHA to the Corporation for Public Broadcasting . . . .
>
> Mr. Lee Wood, Director of Human Resources: I questioned the audit amounts
> claimed in the preparation, completion and submission of the federal audit to the
> Corporation for Public Broadcasting for WSHA recently.  I asked for the explanation
> of $795,935.00 claimed as Expenditures and Losses for WSHA that was far beyond
> and above the actual Shaw University expenditures for WSHA Budget #555, totaling
> $242,926.59 for the same FY 2014-2015 that was audited.
>
> On page 7 of the audit financial statement, it was claimed that WSHA spent:
> $277,881.00 for Production and Broadcasting

---

[5]    Bennett-Bellamy and Stanley-Anderson appointed Nicole Gye'Nyame the de facto manager of
WSHA-FM and required her to participate in all management activity relating to WSHA-FM going forward.

> $479,864.00 for Management and General
> $88,186.00 for Fundraising and Membership
>
> The question is where did these amounts come from ? [sic] Definitely, WSHA never spent $88,186.00 on fundraising and membership, not to mention other larger amounts on Management and General or Production and Broadcasting.
>
> I asked for the explanation so that we all can be ready to explain the amounts to federal auditors especially from the Office of the Inspector General, if they come to audit WSHA. They were here once before based on random selection. The explanation would prepare us to avoid prosecution and bad media publicity locally and nationally. Up till now, Ms. Anderson has not offered any explanation because the audit figures were inaccurate.
>
> Instead of a simple explanation, I was harassed; I was intimidated, all in retaliation mostly by Ms. Anderson. As of now, parallel management of WSHA has been established with decisions for WSHA coming from the Institutional Advancement office, all in retaliation. Ms. Anderson even sanctioned me with an official letter of warning. I have sufficient evidence of the audit discrepancies.
>
> As I write this report to you under Shaw University Whistleblower Policy, Ms. Anderson is still violating some of the federal conditions for the Corporation for Public Broadcasting Grant. This is in addition to other federal non-compliance issues. . . .

(Id. ¶ 84).

In the morning of July 8, 2016, plaintiff began to have serious chest pains and had to go to urgent care for a medical examination. Plaintiff called his supervisor, Bennett-Bellamy, to inform her of his condition. Bennett-Bellamy instructed plaintiff not to come to work if he did not feel well. Plaintiff asked Bennett-Bellamy if she needed anything during his absence, to which Bennett-Bellamy responded that it was not important and that it could wait until plaintiff returned. That day, plaintiff attended Concentra Urgent Care in Raleigh, North Carolina for chest pain and anxiety and was treated by Tiffany Levins, P.A.

On that same date, Stanley-Anderson terminated plaintiff's employment for "Insubordination," as stated in plaintiff's separation from employment form. (Id. ¶ 87). Defendant

claimed that plaintiff had been a "no call, no show." (Id.). Plaintiff alleges he was immediately locked out of his office at WSHA-FM and all of his personal belongings left therein, accumulated over his 28 years of employment, were seized and not returned.

## COURT'S DISCUSSION

A.    Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556. In evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.    Analysis

Plaintiff alleges that defendant retaliated against him in violation of the FCA's whistleblower provision, 31 U.S.C. § 3730(h). This provision prohibits retaliation "because of lawful acts done

by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  31 U.S.C. § 3730(h)(1).

As stated recently by the United States Court of Appeals for the Fourth Circuit, "to sufficiently plead a § 3730(h) retaliation claim and thus survive a motion to dismiss, a plaintiff must allege facts sufficient to support a 'reasonable inference' of three elements: (1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result."  United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 200 (4th Cir. 2018) (citing Iqbal, 556 U.S. at 678; Smith v. Clark/Smoot/Russell, 796 F.3d 424, 433 (4th Cir. 2015)).

1.      Protected Activity

As to the first element of this test, § 3730(h) defines two types of protected activity – acts "in furtherance of an [FCA action]" ("first prong") or "other efforts to stop 1 or more [FCA violations]" ("second prong").  31 U.S.C. § 3730(h)(1).

Regarding the first prong, the Fourth Circuit has "applied the 'distinct possibility' standard: employees engaged in protected activity when 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" Grant, 912 F.3d at 200-01 (quoting Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 344 (4th Cir. 2010)).  "Whether the distinct possibility standard is met is determined from the perspective of the facts known by the employee at the time of the protected conduct." Id. at 201 (citation omitted).

Regarding the second prong, the "distinct possibility" standard does not apply, and instead:

[A]n act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA.  A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that

18

he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not "lead to a viable FCA action" as required under the distinct possibility standard, they must still have a nexus to an FCA violation.

Id. at 201-02 (citing Mann, 630 F. 3d at 344).

a.  Protected Activity – Acts in Furtherance of an FCA Action

There is no dispute that plaintiff repeatedly expressed concern to defendant as to defendant's financial reporting. However, plaintiff has failed to allege that his "opposition to fraud takes place in a context where litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." Mann, 630 F.3d at 344 (citation omitted). Instead, plaintiff alleges that he was "baffled" by the figures, concerned defendant's financial reporting was incorrect and not in compliance with reporting standards, concerned grants for the radio station could be jeopardized, and worried about potential audits. (Am. Compl. (Doc. 22) ¶¶ 57, 66, 67, 81, 84). As no time does plaintiff allege he, for example, "initiated, testified for, or assisted in the filing of a qui tam action during his employment," nor did he ever "inform[] anyone that he was pursuing a qui tam action." Zahodnick v. Int'l Bus. Machines Corp., 135 F.3d 911, 914 (4th Cir. 1997). As stated by the Fourth Circuit, "[s]imply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish [a plaintiff] as acting 'in furtherance of' a qui tam action." Id.

Therefore, plaintiff has failed to allege he was engaged in a protected activity in furtherance of a FCA action.

b.  Protected Activity – Other Efforts to Stop 1 or More FCA Violations

Under the second prong, however, plaintiff has sufficiently alleged he believed defendant was violating the FCA, that this belief was reasonable, that he took action based on that belief, and

that his actions were designed to stop one or more violations of the FCA. See Grant, 912 F.3d at 201-02. Here, plaintiff has alleged he had an objectively reasonable belief that defendant was or would be violating the FCA based on the following: plaintiff's personal experience with the radio station's revenues and expenditures as well as training in CPB requirements, (Am. Compl. (Doc. 22) ¶¶ 29-302); alleged inexplicable amounts represented in defendant's financial reports that plaintiff was pressured to sign with minimal time to review, (id. ¶ 63); alleged hostile reaction to plaintiff's requests for explanation regarding the WSHA-FM financial reporting on February 22, 2016, (id.); and plaintiff's alleged heightened concern for fraud on account of defendant's then-recent history of grant fraud, as well as other alleged suspicious activities, (id. ¶¶ 59, 60).

Additionally, plaintiff sent a letter on April 22, 2016, by and through his counsel, to multiple defendant recipients, stating as follows:

> On or about February 12, 2016, Dr. Emekauwa was asked by Shaw administration to review financial statements prepared for WSHA by a third-party auditor, and discovered what he believed to be a number of financial discrepancies, including the misreporting of expenditures and the omission of certain assets. In a series of e-mails . . . Emekauwa expressed his concerns . . . He did so to comply with Shaw's Whistleblower Policy, under which Shaw "encourages all faculty . . . to report actual or suspected conduct or activities that are a serious violation of University policy or a violation of applicable federal and state law," . . .

(Id. ¶ 81); see also Grant, 912 F.3d at 202 ("These complaints did not merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government.").

In response, defendant argues only that plaintiff's belief of fraud was not objectively reasonable. Defendant offers the General Provisions and February 12, 2016 audited financial statements for defendant's radio station, (DE 24-1, DE 24-3), arguing these documents demonstrate that WSHA-FM had the ability to include certain amounts of revenues and expenditures in the AFS

and AFR outside of what plaintiff was able to observe, or, in other words, outside the bank accounts plaintiff had access to and outside of what plaintiff could observe relating to what the radio station took in as revenue. As stated by defendant, "CPB's guidelines allow grant recipients to report support administrative and contributed support from the University to WSHA-FM as revenues and to allocate the costs of indirect administrative support provided by the University to WSHA-FM as expenses," stating also that "[t]he audited financial statements for WSHA-FM includes notes that describe these practices." (DE 24 at 7).

Assuming that defendant is correct that the documents submitted to the court show there were revenues and expenditures outside plaintiff's knowledge, and assuming the court can consult said documents,[6] defendant's arguments are still unavailing. That defendant had flexibility pursuant to the General Guidelines as to how defendant could report revenues and expenditures and that plaintiff did not have perfect knowledge of defendant's practice in reporting does not illustrate that plaintiff's belief at the relevant time that defendant was violating the FCA was objectively unreasonable nor do these documents fully explain the discrepancies of which plaintiff was concerned.[7] Such is particularly the case here, where at this time the court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff." Nemet Chevrolet, 591 F.3d at 255.

---

[6]    In reviewing a complaint under Rule 12(b)(6), the court "may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State For Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007) (internal citations omitted). Although plaintiff argues the two documents at issue should not be considered by the court, plaintiff concedes plaintiff's "amended complaint does cite to the documents on numerous occasions." (DE 25 at 8).

[7]    In 2016, plaintiff alleges he repeatedly sought information regarding defendant's financial reporting, as the general manager of defendant's radio station, stating that "[w]hen calculated, the total 555 budget for FY 2014-2015 was $266,605.33. How can the station incur expenditures and losses at $795,931.00?" (Am. Compl. (DE 22) ¶ 67).

Plaintiff has sufficiently alleged he engaged in a protected activity by engaging in efforts to stop one or more FCA violations.

2.      Employer Knowledge of Protected Activity

Plaintiff has sufficiently alleged employer knowledge where plaintiff sent an internal report to his supervisor and defendant's auditor complaining about the financial figures and making suggestions of impropriety, to which defendant responded, purporting to hold a meeting to discuss plaintiff's "concerning claims that monies for WSHA are being misused," and where plaintiff received a written warning for making "accusations or inferences of financial mismanagement." (Am. Compl. (DE 22) ¶¶ 74, 79); see Grant, 912 F.3d at 2014 ("Grant complained to United management on numerous occasions in person and in writing about the company's allegedly fraudulent conduct. At least some of his complaints triggered an investigation into whether 'the machine shop was operating faulty equipment and failing to train employees.' . . . . This suffices to satisfy the knowledge prong.").[8]

3.      Adverse Action as a Result of Employer Knowledge

With respect to the third element, the timeline of events alleged supports a reasonable inference that plaintiff was terminated because he engaged in a protected activity. See id. (holding third element sufficiently pleaded where, "here, Grant's termination, following close on the heels of his numerous complaints, represents the ultimate action that an employer can take against a reasonable worker for whistleblowing.").

As stated above, plaintiff sent multiple emails on February 12, 2016 concerning the AFS for the fiscal year 2014-2015 prepared by BDO, to which defendant, in response, held a meeting to

---

[8]      Although later than the events discussed above, defendant concedes that, at least for purposes of the instant motion to dismiss, plaintiff's April 22, 2016 letter provided defendant adequate notice.  (DE 24 at 9).

discuss this issue. Thereafter plaintiff received a formal warning on March 15, 2016, regarding his accusations of incorrect financial reporting. Plaintiff sent an additional letter on April 22, 2016, reiterating and clarifying his accusations. Plaintiff alleges he was thereafter subjected to harassment including the redirecting of his subordinates' reporting, surprise visits to his workplace, exclusion from evaluating subordinates, and an attempt to unnecessarily evaluate plaintiff. Plaintiff then sent another email on June 17, 2016, reiterating his accusations and was thereafter fired for insubordination on July 8, 2016.

Defendant appears to concede that plaintiff has established a causal nexus between the alleged protected activity and the alleged adverse employment action, (see DE 24 at 10-11), but argues that in such a case, defendant may proffer a legitimate reason for the adverse action, shifting the burden back to plaintiff to demonstrate that the defendant's stated reason is pretext for retaliation under the familiar burden-shifting scheme of McDonnell Douglas. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Defendant argues that plaintiff has failed to allege his termination was pretextual, and, "[t]o the contrary, Plaintiff's allegations reveal that his actions would justify termination for insubordination as alleged." (DE 24 at 11; see also DE 27 at 8 ("Plaintiff has failed to plead the requisite 'but for' causation by disclosing the mixed motives for his termination . . . . [which] presents an impenetrable defense to his claims of retaliation.")).

Although many courts analyze section 3730(h) retaliation claims under the McDonnell Douglas burden-shifting framework on summary judgment, defendant has not cited to, nor is the court aware of, precedent requiring plaintiff plead more than that which has been pleaded here to effectively defend against a motion to dismiss a section 3730(h) retaliation claim. Although the parties did not have the benefit of the Fourth Circuit's recent opinion in Grant prior to the conclusion

of briefing of the instant motion, in <u>Grant</u> the court held, as stated above, that plaintiff sufficiently pleaded the third element of a retaliation claim where, as here, "the timeline of events alleged in the SAC supports a reasonable inference that United terminated Grant because he engaged in protected activity." <u>Grant</u>, 912 F.3d at 203.[9]

Here, the court holds plaintiff has sufficiently pleaded an adverse employment action as a result of defendant's knowledge of plaintiff's protected activity.[10]

## CONCLUSION

Based on the foregoing, the court DENIES defendant's motion to dismiss, (DE 23), and DENIES AS MOOT plaintiff's motion to allow discovery, (DE 25). Stay entered November 5, 2018, is LIFTED. Initial order governing planning and scheduling will follow.

---

[9]     To the extent it is necessary, the court further holds that allegations by defendant of plaintiff's insubordination do not render plaintiff's allegations implausible that he was fired because of engagement in protected activities. As stated by the Fourth Circuit in the context of a Title VII claim:

> Whether the City's nondiscriminatory explanation for rejecting the third-lien position is in fact pretext is a question to be analyzed under the long-familiar shifting burdens regime of [McDonnell], and not under Rule 12(b)(6). Still, under <u>Iqbal</u> and <u>Twombly</u>, the Court must consider the plausibility of inferring discrimination based on BNT's allegations in light of an "obvious alternative explanation" for the conduct. In other words, while BNT need not establish a prima facie case at this stage, as discussed supra in Part II.B, we must be satisfied that the City's explanation for rejecting the loan does not render BNT's allegations implausible . . . . The question is not whether there are more likely explanations for the City's action, however, but whether the City's impliedly proffered reason—that a third-position lien presented too great a risk—is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders BNT's claim of pretext implausible. We discern no such weakness in the inferences to be drawn based on the factual allegations here.

<u>Woods v. City of Greensboro</u>, 855 F.3d 639, 649-50 (4th Cir. 2017) (citations omitted).

[10]     Plaintiff's citation to <u>Murphy v. Cty. of New Hanover</u>, No. 7:17-CV-229-FL, 2019 WL 95778, at *5 (E.D.N.C. Jan. 3, 2019) is distinguishable where that case concerned a Title VII claim, the court held plaintiff failed to establish a causal connection between being terminated and filing a lawsuit against his employer where plaintiff was recommended to be terminated prior to initiation of said lawsuit, and where the court noted in the alternative that "at best the complaint discloses mixed motives for terminating plaintiff."

SO ORDERED, this the 14th day of June, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge